## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACQUAN VONTEL SHOOTES,

      Petitioner,

v.                                                    Case No. 3:22-cv-303-TJC-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

## **ORDER**

### I.    **Status**

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is proceeding on a Second Amended Petition, Doc. 17, challenging a state court (Duval County, Florida) judgment of conviction for two counts of aggravated assault (lesser included offenses) and one count of carrying a concealed firearm. Petitioner is serving a forty-year term of incarceration. Respondents filed a Response. See Doc. 20; Resp.[1] Petitioner replied. See Doc.

---

[1] Attached to the Response are several exhibits. See Docs. 20-1 to 20-31. The Court cites the exhibits as "Resp. Ex."

21. This case is ripe for review.[2]

## II.    <u>Governing Legal Principles</u>

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u> <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>,

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

> disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate

4

review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope</u>

<u>v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> "'opportunity to pass upon and correct' alleged
> violations of its prisoners' federal rights.'" <u>Duncan v.</u>
> <u>Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d
> 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404
> U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To
> provide the State with the necessary "opportunity," the
> prisoner must "fairly present" his claim in each
> appropriate state court (including a state supreme
> court with powers of discretionary review), thereby
> alerting that court to the federal nature of the claim.
> <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan</u>
> <u>v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies

results in a procedural default which raises a potential bar to federal habeas

review. The United States Supreme Court has explained the doctrine of

procedural default as follows:

> Federal habeas courts reviewing the constitutionality
> of a state prisoner's conviction and sentence are guided
> by rules designed to ensure that state-court judgments
> are accorded the finality and respect necessary to
> preserve the integrity of legal proceedings within our
> system of federalism. These rules include the doctrine

> of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[3] <u>supra</u>, at 747–748, 111 S. Ct. 2546; <u>Sykes</u>,[4] <u>supra</u>, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>,

---

[3] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[4] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

> 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>,
> 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice
> prong, [a petitioner] must show that "the errors at trial
> actually and substantially disadvantaged his defense
> so that he was denied fundamental fairness." <u>Id.</u> at
> 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there
> remains yet another avenue for him to receive
> consideration on the merits of his procedurally
> defaulted claim. "[I]n an extraordinary case, where a
> constitutional violation has probably resulted in the
> conviction of one who is actually innocent, a federal
> habeas court may grant the writ even in the absence of
> a showing of cause for the procedural default." <u>Carrier</u>,
> 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is
> exceedingly narrow in scope," however, and requires
> proof of actual innocence, not just legal innocence.
> <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir.
> 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir.

---

[5] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Trial and Appellate Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003); <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

This two-part <u>Strickland</u> standard also governs a claim of ineffective assistance of appellate counsel. <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016). When considering deficient performance by appellate counsel,

> a court must presume counsel's performance was
> "within the wide range of reasonable professional
> assistance." <u>Id.</u> at 689, 104 S. Ct. 2052. Appellate
> counsel has no duty to raise every non-frivolous issue
> and may reasonably weed out weaker (albeit
> meritorious) arguments. <u>See</u> <u>Philmore v. McNeil</u>, 575
> F.3d 1251, 1264 (11th Cir. 2009). "Generally, only
> when ignored issues are clearly stronger than those
> presented, will the presumption of effective assistance
> of counsel be overcome." <u>Smith v. Robbins</u>, 528 U.S.
> 259, 288 (2000) (quoting <u>Gray v. Greer</u>, 800 F.2d 644,
> 646 (7th Cir.1986)); <u>see also</u> <u>Burger v. Kemp</u>, 483 U.S.
> 776, 784 (1987) (finding no ineffective assistance of
> counsel when the failure to raise a particular issue had
> "a sound strategic basis").

<u>Id.</u>; <u>see also</u> <u>Owen v. Sec'y, Dep't of Corr.</u>, 568 F.3d 894, 915 (11th Cir. 2009) (recognizing that "failing to raise or adequately pursue [meritless issues on appeal] cannot constitute ineffective assistance of counsel").

To satisfy the prejudice prong of an ineffective assistance of appellate counsel claim, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." <u>Black v. United States</u>, 373 F.3d 1140, 1142 (11th Cir. 2004); <u>see also</u> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal"). Also,

> [a] reasonable probability is a probability sufficient to
> undermine confidence in the outcome." <u>Id.</u>, at 694, 104
> S. Ct. 2052. It is not enough "to show that the errors
> had some conceivable effect on the outcome of the
> proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's

9

> errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. As such, "[a]ppellate counsel might fail to identify a mediocre or obscure basis for reversal without being ineffective under Strickland." Overstreet, 811 F.3d at 1287 (citation omitted).

For both claims of ineffective assistance of trial counsel and appellate counsel, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court

10

decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.    **Relevant Procedural History and Evidence Presented at Trial**

The following procedural and factual history is taken from Petitioner's initial brief filed on direct appeal:

> [Petitioner] was charged by an Amended Information with attempted first-degree murder in Count I, attempted second-degree murder in Count II, and carrying a concealed firearm in Count III. The jury returned verdicts of guilty to the lesser included offense of aggravated assault in Count I, the lesser included offense of aggravated assault in Count II, and guilty as charged in the Information in Count III. On direct appeal, this Court reversed and remanded for a new trial. <u>Shootes v. State</u>, 20 So. 3d 434 (Fla. 1st DCA

11

2009).[6] The case proceeded to a second trial. A mistrial was declared because the jurors were at an absolute and total impasse in reaching a verdict.

The case proceeded to a jury trial for the third time.

. . . .

Detective Hughey, of the Jacksonville Sheriff's Office, testified that on February 15, 2007, he was preparing to execute a search warrant on 111 West 42nd Street. The target of the investigation was Alonzo Wilson. The plan was to lure Wilson out of his house by having a confidential informant contact him and advising they broke down on 20th and Main and have Wilson leave his residence and drive to 20th and Main. After Wilson exited 111 West 42nd Street, he was detained by police. The two ounces of cocaine that were ordered were found. In Wilson's vehicle, an empty gun holster was located in the center console. Wilson said it was his cousin's [(Petitioner's)] car. According to Hughey, Wilson said that if the firearm was not in the vehicle then it would be somewhere near his cousin or back at the residence. Wilson also said he had a large sum of weapons at the residence. Hughey testified that he and Sgt. Demps then devised a plan to lure [Petitioner] out. They had Wilson call [Petitioner] and tell him to come down to 42[nd] and Pearl to assist him as if his car had broken down. Wilson called [Petitioner]. Hughey was not present when [Petitioner] exited the house. [Hughey] later arrived at 111 West 42[nd] Street and was advised of a shooting. He did not witness the shooting.

On cross-examination, Hughey testified it was around dusk or closer to 6:30 p.m. when Wilson

---

6 The First District Court of Appeal reversed Petitioner's judgment and conviction and remanded for a second trial because it found Petitioner was unduly prejudiced by "the conspicuous crowd of" law enforcement personnel in the courtroom on the last day of trial. See Shootes, 20 So. 3d at 440.

contacted [Petitioner] to leave his residence. According to Hughey, it is kind of dark at dusk. [Petitioner] was in handcuffs by the time he arrived at the scene. He remembers [Petitioner] apologizing. The officers were using unmarked cars with tinted windows.

On redirect examination, Hughey testified that the officers were wearing tactical gear, all black, with a JSO badge, and "POLICE" written on [the] front and back of their shirts. They also were wearing gun belts.

On re-cross-examination, Hughey testified that this was a neighborhood where [car] jacking[s] may happen.

Sgt. Demps . . . testified that on February 15, 2007, he was involved in the execution of a search warrant on 111 West 42nd Street. . . . The plan was to lure the target of the investigation, Alonzo Wilson, out of the house. They would detain him and then go back and serve the search warrant. Drugs were recovered from Wilson's person when he was detained and a holster was located in the back seat of his vehicle. Wilson said his cousin was at the house. Wilson also said that the pistol that belonged to the holster was at the house. There was artillery inside the house as well. Demps told Wilson to pretend as if he had a car wreck down the street and get [Petitioner] out of the house.

Demps testified he was riding with [Detective] Hollins. [Officers] Thomas and Hart were in another vehicle. The vehicle [Demps] was in was a burgundy Impala. It was unmarked with no police insignia. Hollins was the driver. They were all wearing tactical vests with badges on them. Thomas and Hart were in a Bonneville. Demps received a call on the Nextel from Hughey who said that [Petitioner] was coming out. He was a black male with a hoodie jacket and dark-colored pants. An in-court identification was made of [Petitioner]. Demps pulled up in front of [Petitioner]. He got out with a shotgun and walked towards

[Petitioner]. He made eye contact with [Petitioner] then thought he heard Detective Hart yell "police" or something else out the window but he could not remember. According to Demps, [Petitioner] reached under his shirt and pulled out a pistol. [Petitioner] fired his gun 3-4 times before he raised his weapon. Demps shot at [Petitioner] five times. Demps then testified that [Petitioner] shot six or seven times. Demps fired his weapon eleven times. After [Petitioner] fell to the ground, he was taken into custody. Rescue was called. As [Petitioner] was being handcuffed and waiting for Rescue, he apologized and said he didn't think they were police. Demps didn't say anything to [Petitioner] before he reached for his weapon.

. . . .

Detective Hollins . . . testified that on February 15, 2007, he was involved with executing a search warrant. Hollins was in a burgundy Impala. Demps was in the passenger seat. Hart and Thomas were in the Pontiac. Thomas was the driver. Hollins was wearing his tactical gear, he had a police vest that said "POLICE" on it. He also was wearing a police badge. After [Petitioner] exited the house, Hollins drove in front of him. Thomas' car drove into place behind [Petitioner]. [Hollins and Demps] both exited the car. Hollins could see [Petitioner]. [Petitioner] looked up at Sgt. Demps and stopped. [Petitioner] made eye contact. According to Hollins, he heard Hart say "police" from the other vehicle as he was getting out. [Petitioner] pulled his shirt up, pulled out a firearm, and fired it at Hart's vehicle. Hollins pulled his firearm and fired back. [Petitioner] ran back towards the house and fell to the ground. He was taken into custody. Hollins testified that he heard [Petitioner] say he thought they were "jack boys."

. . . .

Lavall Thomas, of the Jacksonville Sheriff's

14

Office, testified he was involved in the take-down on February 15, 2007. Thomas was driving the Pontiac Bonneville. Hollins and Demps were in a burgundy Impala. Thomas made an in-court identification of [Petitioner] as the person who exited the residence. According to Thomas, he pulled up behind [Petitioner] and Hart was attempting to exit the vehicle. Demps and Hollins were at the rear of the vehicle. Thomas testified that one could see "POLICE" across Demps' jacket. As Hart was exiting the vehicle, he was yelling "police, get to the ground." [Petitioner] pulled up his shirt and took a shot at the vehicle. Hart got back in the vehicle and fired back out the window. [Petitioner] ran towards the residence. As he exited the vehicle, [Petitioner] was facing down. Thomas testified that he heard [Petitioner] say "I didn't know you were police" and that he "didn't want to shoot at nobody and didn't want to go to jail."

Detective Hart . . . testified that there was a plan to execute a search warrant on 111 West 42nd Street on February 15, 2007. His role was to play a part in the apprehension of [Petitioner]. Hart was wearing black pants, a black shirt, and a black ballistics vest. It had "POLICE" on it. Hart was the passenger of the car that Thomas was driving. It was an unmarked brown Pontiac Bonneville. Demps and Hollins were in the Chevy Impala. Hart made an in-court identification of [Petitioner] as the person who exited the residence. The plan was to have Demps' car pull ahead of [Petitioner] and to have his car pull in behind [Petitioner]. He would then get out and detain [Petitioner]. According to Hart, the unmarked vehicle had tinted windows but the window was down so that [Petitioner] could see him. Hart testified that he opened the passenger door and yelled "police." [Petitioner] started shooting at him. [Petitioner] was walking towards the vehicle and the next thing he knew was that [Petitioner] fired a shot at him. Hart retrieved his AR-15 rifle and began shooting back at [Petitioner]. He saw [Petitioner] fall to the ground. As he approached [Petitioner], [Petitioner] said

15

he was in great pain and did not know they were the police.

Gregory Foxworth, of the Jacksonville Sheriff's Office, testified that he was part of the team that executed the search warrant on 111 West 42nd Street. A semi-automatic firearm was in plain view on top of the refrigerator. On the kitchen table there was approximately $3,000 in cash, marijuana, and cocaine. . . .

Sharon Holmes testified that on February 15, 2007, she was living at 117 West 42nd Street. Between 6:00 and 7:00 p.m.[,] she heard a popping noise. She looked out the window and the police were in her driveway with their guns pulled. The white cop was in uniform. There were also police in jeans with "POLICE" on their back. They were standing around someone.

. . . .

Jess[]e Peterson testified that on February 15, 2007, he was living at 140 West 42nd Street. On the other side of the road, he heard gunshots. They were in the direction of 111. Peterson saw unmarked cars, and detectives with the word "POLICE" on the back of their jackets.

Jeffery Gerbert, a lieutenant with the Jacksonville Sheriff's Office, testified that on February 15, 2007, he was dispatched to a shooting that occurred at 111 West 42nd Street. He was dispatched at 6:34 p.m. Upon arrival, it was dark. [Petitioner] was on the ground handcuffed. [Petitioner] was put in a Rescue Unit and transported to Shands. Although Gerbert could not identify [Petitioner], he testified that he conversed with the individual en route to Shands who said he was in a lot of pain, didn't know what happened, and that he was just standing there and "they shot me."

Neil Chandler, of the Jacksonville Sheriff's

16

Office, testified that on February 15, 2007, he was
dispatched to 111 West 42nd Street to secure the
perimeter. Chandler followed the ambulance. While at
the hospital, he maintained security of [Petitioner].
According to Chandler, [Petitioner] said to the nurse
"they just started shooting me." Prior to [Petitioner]
going into surgery, a female came up and said "did the
police identify themselves" and [Petitioner] said, "no,
mama, they didn't identify themself."

Kim Melvin, an RN at Shands Jacksonville,
testified that she was working in the trauma center on
February 15, 2007. At that time, she came in contact
with [Petitioner]. She asked him what happened and
he said the police shot at him. [Petitioner] also said to
her that he was going down the street and that the
police shot at him and tried to kill him.

Detective Smith . . . testified that he was
dispatched to 111 West 42nd Street in reference to a
police-involved shooting. The scene was processed on
February 15, 2007. On February 26, 2007, Smith went
to Shands to interview [Petitioner]. [Petitioner] was
read his rights and agreed to speak. [Petitioner] said
somebody jumped out of the car and shot him.
[Petitioner] fired two or three shots in the air.
[Petitioner] told him that he was walking down the
street and saw two cars creeping up on him and the
people started shooting. Smith testified he told
[Petitioner] they had evidence that shows the direction
he fired his weapon. [Petitioner] then said he needed to
talk to them at another time.

Detective Mullinex . . . testified that he was part
of the crime scene unit that went to 111 West 42nd
Street on February 15, 2007. Independent of the police
firearms used in this case, he found a .9 millimeter
handgun and .9 millimeter shell casings on the ground.
The police were using .40 caliber. According to
Mullinex, the shell casings were consistent with the
firearm recovered. Mullinex processed Detective

17

Thomas' vehicle. There were bullet holes in the right
fender at the very top, right in the center of the front
door frame, and the third one was located at the bottom
of the right rear door.

Maysaa Farhat, a crime lab analyst in the
Firearm Section of [the] Florida Department of Law
Enforcement, testified that he examined a .9 millimeter
Luger caliber high point-model C9, semi-automatic
pistol. Of the items recovered, one of the fragments
(projectile) had markings on it that were consistent
with being fired from a high point .9 millimeter
handgun. One of the items was of no value, and the
other item he examined was of the same class but there
was no determination whether or not it was fired from
the particular firearm or not. It was, however,
consistent with a high point .9 millimeter firearm with
the markings of that particular manufacturer. Farhat
also compared shell casings from this case and test-
fired them from the .9 millimeter gun. In his opinion,
the cartridge cases recovered were fired from the pistol
he received.

Antonio Miller testified that he is currently
incarcerated in the Duval County Jail awaiting
resentencing. While in the jail, he came in contact with
[Petitioner] as they were in the same dormitory. An in-
court identification of [Petitioner] was made by Miller.
According to Miller, [Petitioner] talked about his
situation with him. People would come to him about the
law as he attended the School of Paralegal Studies in
Norcross, Georgia. Miller is a jail house lawyer.

According to Miller, [Petitioner] told him that he
was at his cousin's house on 42nd and Main.
[Petitioner] said that his cousin, a guy by the name of
Alonzo Wilson, was going to make a drug sale. Both
Wilson and [Petitioner] did drug deals out of the house.
After Wilson left the house to do a drug transaction,
[Petitioner] was looking out the window to see what
was going on outside and he said that he saw what he

believed was a vice car; a car with tinted windows,
tinted dark windows. [Petitioner] said he was spooked.
[Petitioner] told him he received a phone call from
Wilson. [Petitioner] got his hoodie, went out of the
house, and had his gun with one in the chamber. As he
turned toward Pearl Street, the passenger door of the
Impala swung open and the undercover officer got out
of the car. According to Miller, [Petitioner] said he saw
"POLICE" across his chest and when [Petitioner] saw
"POLICE" across the officer's chest, [Petitioner] just
flipped out mentally. The officer had a shotgun pointed
downward and both of them made eye contact. At that
point, [Petitioner] said after he saw some hesitance on
the part of the officer, he was going to try to make a
break for it. [Petitioner] shot first. Miller then testified
that he left out the part that [Petitioner] told him he
heard the officer behind him say "freeze, stop, get down,
stuff like that." According to Miller, [Petitioner] wanted
to use a self-defense theory. [Petitioner] wanted to use
a theory that he did not know it was the police and it
was just some random "jack boys"; that type thing.
[Petitioner] also said that he was going to bring up a
prior attempted robbery, something he just made up for
the purpose of convincing the jury. [Petitioner] said
that the prior robbery never took place and that it was
something that he wanted to use in his defense to
convince the jury so to speak. Miller also testified that
[Petitioner's] rationale for shooting at the police was
that he wanted to get away and did not want to get
busted.

      . . . .

      On redirect examination, Miller testified that he
was sentenced to 60 years for two sales of cocaine. He
hoped that his testimony may be considered by the
judge as to whether or not he gets 60 years again. Miller
also testified that another part of the defense that he
and [Petitioner] went over was the lighting that night.
According to Miller, [Petitioner] was going to say that
it was darker than it actually was that night and that

19

he couldn't tell it was an officer so to speak.

For the defense, Isaac Wilder testified that he is serving a life sentence. Wilder met Antonio Miller at the Duval County Jail as they were in the same dorm. Miller talked to him about the benefit of becoming a jail house informant. Miller also talked to him about [Petitioner's] case and how he obtained information from [Petitioner]. Miller would read [Petitioner's] paperwork while he was gone. Miller told Wilder that he couldn't get [Petitioner] to talk about anything. He was getting information about [Petitioner's] case from the outside through his girlfriend, through a partner he worked with in the past, and through his attorney. Miller talked to him about how [Petitioner's] case would get him a lot of points. In other words, Miller's time would be knocked off because of the publicity of the case.

Avery Highsmith testified that he is under a sentence for false imprisonment. He would rake yards in the neighborhood of 42nd Street. On February 13, 2007, he went to Alonzo Wilson's house to do yard work. Highsmith spoke to Wilson and [Petitioner]. Highsmith told [Petitioner] that there are guys going around the neighborhood robbing people. They were riding around in a 626 Mazda and a lot [of] shooting was going on.

[Petitioner] testified that he was at Alonzo Wilson's house on the 15th[.] He got over there between 12:30 and 1:30 p.m. Cap, also known as Avery Smith, came to the door that day and told him to be careful out there. There was a 626 Mazda robbing people and shooting people. [Petitioner] testified that he went to his car and retrieved his pistol. He went back to the entertainment room in the house.

[Petitioner's] cousin, Alonzo Wilson, was in his room. [Petitioner's] cousin soon left the house and asked if he could hold [Petitioner's] car. [Petitioner] said sure and gave him the key. The holster was still in

the car in the middle compartment between the seats.
[Petitioner] testified that he heard from Wilson again
about 20 minutes later. [Petitioner] just turned on the
6:00 p.m. sports center. Wilson said he was having car
trouble and was in the Pearl Street area. [Petitioner]
walked out, had his hoodie on, and went towards Pearl
Street. [Petitioner] had his gun with him based on what
Cap told him about the Mazda. He was walking down
the sidewalk and heard a person who was fixing to rob
him or even try to kill him. He was in fear. [Petitioner]
reached for his handgun and turned. There was
another car but nobody said anything. [Petitioner] went
to run and started shooting towards the person that
was threatening his life. [Petitioner] testified he did not
see anything written on the person's shirt who was
holding a weapon. He did not see a badge that said
Sheriff's Office or the word "POLICE" across the chest.
This was around 6:30 p.m. It was dark, he was under
trees, and all he saw was this big object. He did not
recognize anyone to be a policeman in the car that
pulled up behind him. [Petitioner] was not trying to hit
anyone but was just trying to get away. [Petitioner]
started running and he fell as he was shot. They kept
shooting while he was on the ground. Individuals came
up to him and gathered around him. [Petitioner]
testified that he said "don't take my life." He thought
they were trying to rob him. One of them said "we are
the police." [Petitioner] said, "I would never shoot at
police, I thought you were trying to rob me."

While at the hospital, [Petitioner] remembered
seeing his mom. She asked him who did this to him and
he said the police. She asked him did they identify
themselves and he said no, they didn't. [Petitioner]
learned he was shot 21 times. [Petitioner] could not
recall his conversation with Detective Smith as he was
on morphine and Percocet at the time. While at the jail,
he learned that Antonio Miller was a snitch. He found
this out when he first got into the dorm. [Petitioner]
testified that he did not talk to anyone about his case
at the jail.

On cross-examination by the State, [Petitioner]
testified that he had no idea of the $3,000 in cash, the
cocaine, or the other drugs in the kitchen. [Petitioner]
also testified about an attempted robbery that occurred
on December 13, 2005, when shots were fired at him.
This played a part as to how he reacted in this case. The
incident in 2005 occurred at 4628 Springfield
Boulevard. The police were never called. The shots hit
the house. There were wood chippings from the shots.
There was a second incident in which the police were
called. This was a burglary to the house at 4628
Springfield Boulevard but he was not at the house at
the time. [Petitioner] also testified on cross-
examination that no one said "police" that night.

Andrew Daniels testified that in 2005 he resided
with [Petitioner] at 4628 Springfield Boulevard.
Daniels heard [Petitioner] say to someone that he did
not have any money while on the house property. There
was a second incident within a two-week time span. In
the first incident, he heard a series of loud shots. He
was in the house when he heard the shots. [Petitioner]
said to him, "hey brother are you all right, yes, I'm
okay. What's going on, I have no idea what's going on,
make sure you stay safe." [Petitioner] was frightened
and scared. 911 was called but he didn't wait for the
police. In the second incident, the house was
burglarized. The police were called and a report was
taken. Daniels testified that he observed shattered
pieces of wood on the house that were not there prior to
the gunshots from the incident. After the incident,
[Petitioner] acquired a gun for his safety.

. . . .

Dr. Harry Krop, a licensed clinical psychologist,
testified that he conducted a forensic psychological
evaluation on [Petitioner]. Dr. Krop read affidavits of
witnesses, depositions, prior transcripts of prior
proceedings, and an affidavit from Andrew Daniels. Dr.

22

Krop diagnosed [Petitioner] with situational depression and post-traumatic stress disorder. In Dr. Krop's opinion, [Petitioner's] post-traumatic stress disorder was operating at the time of the incident.

On cross-examination, Dr. Krop testified that he would not have diagnosed [Petitioner] with post-traumatic stress disorder if he had not experienced a prior incident from 2005.

In rebuttal, Alexander Chambers, of the Jacksonville Sheriff's Office, testified that on December 15, 2005, he was dispatched to a burglary complaint at 4628 Springfield Boulevard. Chambers met with Daniels. The front door was forced in. The door jamb was busted. According to Chambers, Daniels did not report a shooting nor did he point out any bullet holes.

Christy Conn, of the Jacksonville Sheriff's Office, testified that in December 2005 she was a crime scene technician. On December 15, 2005 she was dispatched to 4628 Springfield Boulevard. She did not observe bullet strikes or bullet damage to the front door area of the residence. Nothing was mentioned about a previous shooting nor were any photographs taken.

Resp. Ex. B12 at 4-19 (record citations omitted).

In its answer brief, the state generally accepted Petitioner's statement of the facts. Resp. Ex. B13 at 5. But it added these clarifications:

Sgt. Demps testified that when he exited the vehicle with the shotgun, it was pointed down and the safety was on. [Petitioner] fired three to four shots before Sgt. Demps could raise the shotgun and engage, shooting at [Petitioner] five times. After he emptied the shotgun, he used his handgun, firing at [Petitioner] eleven times. [Petitioner] fired three shots at Detective Thomas' vehicle before pointing his gun at Sgt. Demps. At the time Detective Hart was yelling something, Hart

was closer to [Petitioner] than Sgt. Demps was. On cross-examination, Sgt. Demps stated the purpose of the warrant was not guns, it was cocaine. [Petitioner] was detained to get him away f[rom] the weapons and then serve the warrant. The area was well lit. He was "pretty sure" Detective Hart yelled police. All of the officers had "Police" on them the entire time and it was evident that they were officers.

On re-direct, photos of how Sgt. Demps was dressed that night which were taken that evening at the Police Memorial Building were introduced. Detective Hart was yelling at [Petitioner] prior to the time [Petitioner] produced the gun and shot at him. The officers did not fire at [Petitioner] until after he fired at them.

Detective Hollins identified photos taken the night of the shooting depicting his attire, including the vest with "Police" on it. It was still visible outside when they arrived to execute the warrant. [Petitioner] looked at Sgt. Demps, looked at Detective Hollins and then looked back at Sgt. Demps. At that point, Detective Hollins had not thought there was any reason to pull out his gun. He heard Detective Hart say "Police." After he was apprehended, [Petitioner] asked if they were going to take him to jail; he mentioned it first. On cross-examination, Detective Hollins testified he could see [Petitioner] and [Petitioner] could see him.

Detective Thomas testified from where he was sitting in his car, he could see Sgt. Demps and see the word "Police" written across the Sgt.'s jacket. He heard Detective Hart yell "police, get on the ground," as Hart exited the vehicle. [Petitioner's] first shot entered Thomas' vehicle. The shot brought Detective Hart back into their vehicle, literally on top of Detective Thomas, as he fired back at [Petitioner] through the window. Both officers were then able to exit the vehicle. After [Petitioner] was apprehended, he heard [Petitioner] say that he didn't want to go to jail; none of the officers

mentioned jail. Detective Thomas identified photos of himself taken that night in the tactical gear he wore.

Detective Hart testified that he was attired in a tactical ballistics vest that had "police" on the front and back of it. It was worn for officer safety and clearly identified him as an officer. After Alonzo Wilson was detained, Detective Hart went back to the house about 15 minutes later. Detective Hart identified photographs of how he was dressed that night, including a mask he donned after the shooting to protect his identity. When [Petitioner] exited the residence and they pulled out, Detective Hart's window was rolled down so he could get a good look at [Petitioner], announce their identity and allow [Petitioner] to see who was in the car. He did not have any weapons in his hand as they drove up. He had no difficulty seeing [Petitioner]; it was still light out.

As they came to a stop, Detective Hart opened his door and yelled "Police" through the microphone at the same time; it was very loud. [Petitioner] began shooting directly at him [ ], immediately after he announced they were police. He was certain [Petitioner] fired the first shot. He did not have time to yell anything else before [Petitioner] opened fire. At the time he believed [Petitioner] fired two shots into the vehicle; he later learned it was three. Detective Hart retrieved his AR-15 and began shooting back at [Petitioner].

. . . .

Sharon Holmes testified that . . . [w]hen she looked out of the window she saw officers in her driveway pointing guns toward the Wilson residence. One white cop was in full uniform while others were standing around someone. They were wearing things which read police on the back, she could only see their backs. Based upon her vantage point, she could tell they were police.

25

. . . .

> Jesse Peterson testified that . . . [h]e could see officers with the word police on their vests. He was immediately able to recognize them as police.

> Lt. Jerry Gerbert[,] of the Jacksonville Fire Department, testified that the only thing [Petitioner] said when he was being transported to the hospital was that he was just standing there and they shot him.

> RN Kim Melvin testified that [Petitioner] never said anything to the effect that he thought he was being robbed or anything about jack men.

Resp. Ex. B13 (record citations omitted).

## IV.    **Second Amended Petition**

### Ground One

Petitioner contends his trial counsel was ineffective for allowing his justifiable use of deadly force defense to be negated by the trial court's reading of the inapplicable "stand your ground/no duty to retreat" portion of § 776.013(3), Florida Statutes. Doc. 17 at 5. According to Petitioner, his self-defense theory at trial arose under only § 776.012, which at the time of his trial contained no duty to retreat regardless of Petitioner's unlawful activity.[7] In contrast, § 776.013(3), which Petitioner contends was a separate theory of self-defense inapplicable to Petitioner's case, contained a duty to retreat for those

---

[7] In 2014, the legislature amended § 776.012 to include the "unlawful activity" preclusion contained in § 776.013(3). See Garrett v. State, 148 So. 3d 466 (Fla. 1st DCA 2014).

engaged in unlawful activity. He also argues trial counsel should have

requested a special instruction on duty to retreat. Id.

Petitioner raised this claim in his Florida Rule of Criminal Procedure

3.850 motion. Resp. Ex. D1 at 34-42. The trial court summarily denied the claim

as follows:

> In his first claim for relief, Defendant alleges that
> defense counsel was ineffective for failing to object to
> the Court's reading [of] the inapplicable "stand your
> ground/no duty to retreat" instructions from section
> 776.013(3), Florida Statutes, and for failing to request
> a special jury instruction on duty to retreat. The
> allegedly objectionable jury instruction was read as
> follows:

>> If the defendant was not engaged in an
>> unlawful activity and was attacked in any
>> place where he had a right to be he had no
>> duty to retreat and he had the right to
>> stand his ground and meet force with force
>> including deadly force if he reasonably
>> believed that it was necessary to do so to
>> prevent death or great bodily harm to
>> himself or to prevent the commission of a
>> forcible felony.

> Defendant alleges the instruction was based on section
> 776.013(3), Florida Statutes, but that the correct
> instruction, on which his defense was based, should
> have tracked section 776.012, Florida Statutes, which
> imposes no duty to retreat regardless of whether a
> defendant is engaged in unlawful activity. Defendant
> admits that, by carrying a concealed firearm, he was
> engaged in unlawful activity. He asserts that the
> instruction read to the jury "negated" his defense.

> Defendant cites Stoute v. State, 987 So. 2d 748,

27

749 (Fla. 4th DCA 2008), where an erroneous jury instruction was solely responsible for negating that defendant's only defense of self-defense. Similarly, in Dorsey v. State, 149 So. 3d 144, 145 (Fla. 4th DCA 2014), the court found fundamental error and reversed for a new trial where a jury was erroneously instructed to consider a defendant's duty to retreat. The instant case, however, is distinguishable and is more like Garrett v. State, 148 So. 3d 466 (Fla. 1st DCA 2014). In addition to the instruction quoted above, this jury was instructed, without reference to a duty to retreat, that "[a] person is justified in using deadly force if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the imminent commission of a robbery against himself or another." Although, like here, the jury in Garrett was erroneously instructed that the defendant had a duty to retreat if engaged in unlawful activity, the Garrett court looked at the jury instructions as a whole and determined that

> Garrett's claim of self-defense turned on whether the evidence before the jury supported a reasonable belief that Garrett was under threat of imminent death or great bodily harm or the imminent commission of a forcible felony by [the alleged aggressor]. The erroneous instruction did not affect the jury's ultimate responsibility to determine whether the threat faced by Garrett was imminent, in which case retreat would be futile and his use of deadly force would be justified, irrespective of whether he was engaged in unlawful activity at the time.

Garrett, 148 So. 3d at 472-73 (emphasis in original). Based on that analysis, the Garrett court found no fundamental error in the jury instructions. Id. at 473. Defendant is mistaken when he asserts that "defense counsel ignored the fact that the only instruction

28

explaining his defense, actually negated it." Like the jury in <u>Garrett</u>, this jury was given an instruction on imminent harm which was not conditioned on the lawfulness of Defendant's activity and therefore would have allowed them to find for Defendant. The jury instructions, viewed as a whole, did not negate Defendant's only defense. Therefore, counsel's failure to object to the jury instructions was not deficient performance.

There was testimony at trial about the dress and appearance of the officers involved, and what could be seen and recognized, even from farther away than from where Defendant was. Detective [ ][8] testified that some of the officers involved in the shooting with Defendant were dressed in black tactical gear with a JSO badge on it and the word "police" on the front and back, as well as gun belts with handcuffs, radios, etc. Sergeant [ ], one of the four officers involved, was dressed at trial in the same way as [he was] on the day of the shooting: in a jacket marked with police insignia and a gun belt. He testified that the other three members of the team that day wore tactical vests with a badge. Sergeant [ ] testified he got a good look at Defendant's face before he got out of the car and faced Defendant from 30-40 feet away and that he and Defendant made eye contact as they stood facing each other. This is in contrast to Defendant's testimony that he did not focus on Sgt. [ ] or his clothing, but only saw the sergeant's gun.

Detective [ ], the driver of the car where Sgt. [ ] was a passenger, testified he wore tactical gear including a gun belt and a vest bearing police markings and a badge. He testified [it] was 6:20 or 6:30 in the evening, and that he could still see outside, and that Defendant appeared to see him and Sgt. [ ] and to make eye contact with them. While Defendant was looking at

---

[8] In its Rule 3.850 order, the trial court redacted the names of the officers involved in the incident.

Det. [ ] and Sgt. [ ], Det [ ] got out of the other car, and
Det. [ ] heard Det. [ ] yell, "police" and "get on the
ground." Defendant testified that no one said anything.
While he was still in the car after stopping, Sgt. [ ] could
clearly see Sgt. [ ] standing beside the other car and
could see the word "police" across Sgt. [ ]'s jacket.
Sergeant [ ] also testified that he heard Det. [ ] yelling
"police" and "get down." Detective [ ] was riding in the
front passenger seat of an unmarked police car. He was
dressed in black pants, shirt, and vest, with "police"
marked on the front and back of the vest. The car Det.
[ ] was riding in came to a stop behind Defendant on the
sidewalk after the other car had stopped in front of
Defendant. When the car stopped, Det. [ ]'s window was
lowered so he could communicate with Defendant and
Defendant could see who was in the car. After the cars
stopped, Det. [ ] opened his car door, placed one foot
outside, and yelled, "police," and Defendant began
shooting at Det. [ ].

After Defendant had been shot and Det. [ ] was
approaching him, Defendant was face down on the
ground, facing away from Det. [ ] when Defendant said
he did not know they were police. The unlikelihood that
he could see Det. [ ] approaching as he was speaking
(and, therefore, identify him as police for the first time)
is further evidence that Defendant knew they were the
police while he was shooting at them.

Sharon Holmes, who lived next door to
Defendant's cousin's house (where Defendant was
walking from when the unmarked police cars pulled
up), testified that, after hearing popping and booming
sounds, she looked out her front window and saw
several police officers standing around someone near
Defendant's cousin's house wearing jeans and with
"police" marked on their upper backs. The jury also
heard from Jesse Peterson, who lived across the street
and a few houses away from Defendant's cousin's
house. Mr. Peterson heard gunshots from the direction
of Defendant's cousin's house and went out on his front

porch. From his porch, Mr. Peterson could see two
unmarked cars and detectives with the word "police" on
their jackets and vests.

There was ample evidence about the visibility of
identification on the police officers' clothing, the
available lighting, and Detective [ ]'s verbal
identification of them as police, from which the jury
could have concluded that Defendant should have
known, or actually did know, that he was shooting at
police officers performing their duty, which would have
defeated his claim of self-defense. The failure of
Defendant's defense of justifiable use of force was just
as likely, if not more likely, attributable to the fact that
the jury gave little credence to Defendant's testimony
that he believed he was defending himself from
robbers, than to a jury instruction. Therefore, had
counsel objected to jury instructions and argument that
Defendant could not avail himself of the defense of
justifiable use of force because he carried a firearm
illegally, and had counsel requested a special jury
instruction on duty to retreat, there is no reasonable
probability that the outcome of [the] trial would have
been different. See Shootes v. State, 20 So. 3d 434, 436
(Fla. 1st DCA 2009) (reversing after first trial, noting
that "visual presentation of the officers was . . . a
feature of the trial and was pivotal to Appellant's
theory of defense."). Defendant's first ground is without
merit.

Resp. Ex. D1 at 135-39 (record citations omitted). Petitioner appealed, and the

First DCA per curiam affirmed the trial court's denial without a written

opinion. Resp. Ex. D5.

The Court addresses this claim in accordance with the deferential

standard for federal court review of state court adjudications. In doing so, the

Court heeds the state court's conclusion that it was error to include §

31

776.013(3)'s unlawful activity/duty to retreat language in the jury instruction
for justifiable use of deadly force. When Petitioner committed the offenses in
2007, § 776.012 and § 776.013(3) contained subtle and important distinguishing
characteristics – the former having, at that time, no duty to retreat regardless
of unlawful activity – and because Petitioner presented evidence supporting a
defense under § 776.012, he was entitled to receive an instruction that followed
only the language of that statute. See Garrett, 148 So. 3d at 471 (citing Little v.
State, 111 So. 3d 214 (Fla. 2d DCA 2013) (explaining at length the
distinguishing characteristics of § 776.012 and § 776.013(3)). But during the
trial court's charge conference, the parties and the trial court did not have the
benefit of the Second District Court of Appeal's decision in Little, the case on
which the First DCA relied on in Garrett, because it was issued in April 2013;
nor did they have guidance from the flurry of post-Little case law clarifying the
distinct avenues of § 776.012 and § 776.013(3). See Dooley v. State, 268 So. 3d
880, 887 (Fla. 2d DCA 2019) (collecting cases). Instead, the parties agreed that
at that time, the justifiable use of deadly force instruction used in Petitioner's
case tracked the standard jury instruction. Resp. Ex. B14 at 815-16.

But of more import, the Court defers to the state court's conclusion that
the erroneous jury instruction did not affect the outcome of Petitioner's trial;
and thus, in turn, Petitioner has failed to show prejudice under Strickland.
While the improper instruction required the jury to consider if Petitioner had a

duty to retreat based on unlawful activity, the trial court also instructed that the lawfulness of Petitioner's activity had no impact on Petitioner's actions if Petitioner reasonably believed that force was necessary to prevent imminent death or great bodily harm. Resp. Ex. B1 at 170-71; <u>see also</u> § 776.012, Fla. Stat. (2009) ("[A] person is justified in the use of deadly force and does not have a duty to retreat if . . . [h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.").

Additionally, as the state court explained, considering the totality of the evidence, as well as the jury instructions as a whole, the jury had ample facts to conclude that Petitioner was not justified in using deadly force. As such, Petitioner cannot show that but for trial counsel's alleged error, the outcome of his trial would have been different. Thus, upon review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>See</u> 28 U.S.C. § 2254(d). Ground One is denied.

**Ground Two**

Petitioner argues that his trial counsel was ineffective for opening the door during Detective Smith's trial testimony and allowing the state to elicit testimony that made Petitioner's "right to remain silent a feature of the trial."

Doc. 17 at 10-14.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. D1 at 67.

The trial court summarily denied the claim as follows:

> In his seventh claim for relief, Defendant alleges
> that counsel was ineffective for opening the door and
> permitting the State to make his invocation of his right
> to remain silent a feature of the trial. He asserts
> counsel opened the door by faulty cross-examination of
> Detective Warren Smith that elicited testimony that
> Defendant invoked his right to remain silent once
> confronted with evidence of bullet holes in [ ] one of the
> officers'  cars,  which  contradicted  Defendant's
> statement to the witness that he had fired shots "into
> the air." Detective Smith testified he was the lead
> investigator of the shooting and, in that capacity, he
> went to Shands Hospital 11 days after the shooting to
> interview Defendant. He read Defendant his rights in
> the hospital room. He testified that Defendant told him
> somebody jumped out of the car and shot at him, and
> that he fired two or three shots in the air. Detective
> Smith testified he told Defendant that, based on
> evidence of gunshots to the car carrying Detectives [ ]
> and [ ], Defendant fired at the police, and he asked
> Defendant to tell him what he knew, from the
> beginning. During his narrative, Defendant told Det.
> Smith again that he fired two or three times into the
> air. When Det. Smith told Defendant the police had
> evidence of the specific direction Defendant had fired
> his weapon, Defendant stated that he needed to talk to
> the police later, at another time, and the interview
> ended.
>
> On cross-examination, defense counsel elicited
> testimony that Defendant told Det. Smith he needed to
> get some sleep and talk to his attorney, which defense
> counsel characterized as exercising his constitutional
> right not to speak. Defense counsel elicited testimony
> that the police officers involved in the shooting also

spoke with their attorneys before making a statement. On redirect, the State elicited testimony that Defendant asked for his lawyer when the detective confronted him about the bullet strikes in the police officers' car. In its first closing argument, the State mentioned that Defendant asked for a lawyer when Det. Smith confronted him about the evidence of bullet holes in the car. In Defendant's closing, counsel argued that, when Defendant realized Det. Smith was there to try to get evidence to convict Defendant, he had the good sense to stop talking and ask for a lawyer, which was his right. In its rebuttal closing, the State mentioned Defendant's request for a lawyer as proof that he understood his rights, but emphasized the fact that Defendant did not tell Det. Smith he believed he was being robbed.

It is evident that, even without the cross-examination, based on Det. Smith's testimony on direct examination, the State would have pointed out in argument that Defendant ended the interview with police when he was confronted with evidence of gunshot damage to the car. The addition of the fact that he also asked for a lawyer upon ending the interview did not become a feature of the trial, as Defendant alleges. Had counsel not elicited the fact that Defendant asked for a lawyer, there is no reasonable probability that the outcome of trial would have differed.

On [direct] appeal, Defendant argued that the State's commentary on Defendant's invocation of his right to remain silent constituted fundamental error. The First District's rejection of that claim of error means Defendant is unable to show prejudice on this Amended Motion based on the State's closing argument. See Chandler v. State, 848 So. 2d 1031, 1046 (Fla. 2003). If the State's argument did not result in prejudice sufficient to undermine confidence in the outcome, it follows that neither did defense counsel's performance which opened the door to that argument. Defendant's seventh ground is without merit.

Resp. Ex. D1 at 146-47 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. D5.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. As the trial court noted, regardless of trial counsel's cross-examination, Detective Smith would have testified on direct examination about Petitioner ending the interview once Smith confronted him with evidence of the direction Petitioner fired his weapon. To explain Petitioner's actions, on cross-examination, trial counsel merely elicited testimony that it was Petitioner's right to terminate the conversation and that his decision to not discuss anything further was not dispositive of Petitioner's guilt. This testimony did not become a feature of the trial, and Petitioner has failed to show that but for this alleged error, a reasonable probability exists that the outcome would have been different. As such, upon review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d). Ground Two is denied.

**Ground Three**

Petitioner argues that his trial counsel was ineffective for failing to argue

36

"collateral estoppel" based on the state appellate court's oral argument during Petitioner's direct appeal, following his first trial, during which the appellate court discussed Petitioner's motion to suppress. Doc. 17 at 15-16. According to Petitioner, since the motion to suppress was discussed during oral argument and the appellate court suggested the subject statements were obtained illegally, trial counsel should have put the trial court on notice during the third trial that the trial court "had a ministerial duty to grant" the motion to suppress. Id. at 16.

Respondents argue that Petitioner never presented this claim to the state court, and thus it is unexhausted and procedurally defaulted. Resp. at 8-10. Petitioner concedes that he never presented this claim to the state court but argues that it is not procedurally defaulted because this Court permitted him to file the Second Amended Petition raising this claim. Doc. 21 at 6-7. He otherwise attempts to overcome the procedural bar under Martinez, arguing that he can show "cause" to excuse his default because he did not have postconviction counsel during his state court Rule 3.850 proceedings. Id. at 7.

To the extent that Petitioner relies on this Court allowing him to file a Second Amended Petition to overcome his failure to present this claim to the state court, that argument fails. In allowing Petitioner to amend, the Court made no findings as to the merits or procedural correctness of his claims.

37

As to Petitioner's other argument, under <u>Martinez</u>, Petitioner must prove more than the general assertion that the trial court did not appoint counsel in the initial-review collateral proceeding. 566 U.S. at 14. Petitioner must "also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>Id.</u> (citations omitted); <u>see also</u> <u>Lambrix v. Sec'y Fla. Dept. of Corr.</u>, 851 F.3d 1158, 1164 (11th Cir. 2017). But his claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." <u>Id.</u> at 16. For the reasons that follow, the Court finds that even if Petitioner shows that his lack of postconviction counsel caused his procedural default, he cannot show that his underlying ineffective assistance of counsel claim is substantial.

Under Florida law, collateral estoppel applies in a case if (1) an identical issue is disputed, (2) that has previously been fully litigated, (3) by the same parties or their privies, and (4) a final decision has been rendered by a court of competent jurisdiction. <u>Stogniew v. McQueen</u>, 656 So. 2d 917, 919-20 (Fla. 1995); <u>Essenson v. Polo Club Associates</u>, 688 So. 2d 981, 983 (Fla. 2d DCA 1997); <u>Quinn v. Monroe Cnty.</u>, 330 F.3d 1320, 1329 (11th Cir. 2003).

Prior to his first trial, in July 2007, Petitioner, through trial counsel, moved to suppress the statements Petitioner made to officers while he was in the hospital immediately after the incident, arguing he was under the influence

of narcotics and pain medication that rendered those statements involuntary. Resp. Ex. B1 at 66-67. During his third trial, in February 2011, however, Petitioner's pre-trial motion to suppress sought to suppress – "Any and all evidence illegally seized, including but not limited to: a 9mm firearm and/or any verbal and non-verbal conduct on the part of the [Petitioner], by and through the officers' illegal search and seizure, based on a police-citizen encounter involving an illegal investigatory stop[,]" because, at the time of the take down, officers did not have probable cause to believe that Petitioner had committed or was committing a crime. Resp. Ex. B3 at 430-41.

Here, because the factual issues discussed in Petitioner's first motion to suppress were not identical to those discussed and argued in his 2011 motion to suppress, collateral estoppel does not apply. See, e.g., Marton v. Lazy Day Prop. Owners Ass'n, Inc., No. 2:10-cv-117-FTM-29-DNF, 2011 WL 1232375, at *4 (M.D. Fla. Mar. 30, 2011) ("[C]ollateral estoppel does not apply because the issues presented in the State Action are different from the issues presented in this case."). Thus, because a collateral estoppel argument would have failed this claim lacks merit and therefore is insubstantial. As such, Petitioner cannot rely on Martinez to excuse the procedural default of this claim. Likewise, Petitioner has failed to demonstrate that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Three is due to be denied.

Case 3:22-cv-00303-TJC-PDB    Document 23    Filed 03/13/25    Page 40 of 49 PageID
6635

**Ground Four**

Petitioner asserts that his trial counsel was ineffective for failing to call eyewitness Justin Daughrity[9] to support Petitioner's self-defense theory at his third trial. Doc. 17 at 17-18.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. D1 at 58. The trial court summarily denied the claim as follows:

> In his fifth claim for relief, Defendant alleges that counsel was ineffective for failing to call an eyewitness, Justin Daughrity. Defendant asserts Daughrity's testimony would have supported Defendant's claim of self-defense. Defendant claims the witness saw unmarked police cars suddenly stopping, and black males exiting the cars, thought a robbery was in progress, and did not see "police" on their clothes until they began running. Defendant asserts the witness would have corroborated Defendant's belief that undercover officers were attempting to rob Defendant.

> In the first trial, the witness testified that he was parked on the south side of 42nd Street when a maroon car pulled up next to him. When the car pulled up, he looked and did not recognize who it was, but saw that they were jumping out of the car. He did not know if they were going to rob him, so he locked his doors. After they got out of the car, the witness could see their backs and recognized them to be police officers by the police markings on their clothes. At the second trial, the witness testified he did not see they were police when they first exited the car, but only after they began running. The witness was impeached with testimony given at the first trial and conceded that he recognized

---

[9] In his Second Amended Petition, Petitioner spells this witness' name as "Daughrity," but the trial court's order mentions that the transcripts use the spelling "Daughtry" and "Daughtrey." Resp. Ex. D1 at 143 n.2.

the men as police by seeing the backs of their shirts immediately after they jumped out of the car. The witness is a convicted felon. The witness' testimony contradicted Defendant's testimony. The witness testified it was still daylight outside. He testified that police began yelling immediately after exiting car, followed by gunfire. Defendant testified that it was dark. He testified that no one spoke until after [the] shooting was over.

The records of the three trials confirm that Defendant was not prejudiced by the absence of Justin Daughrity's testimony at the third trial, and indeed may have benefited from it. Defendant's fifth ground is without merit.

Resp. Ex. D1 at 143-44 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. D5.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court has reviewed the exhibits to the trial court's denial order, which includes excerpts from Daughrity's trial testimony at Petitioner's first and second trials and finds that Daughrity's contradictory statements and testimony would not have changed the outcome of Petitioner's third trial. Resp. Ex. D1 at 343-45, 397-98. Upon review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d). Ground Four is denied.

**Ground Five**

Petitioner alleges his trial counsel was ineffective for failing to file a motion to dismiss based on Florida's "Stand Your Ground" immunity from prosecution. Doc. 17 at 19-21.

Respondents argue that Petitioner did not present this claim to the state court, and thus it is unexhausted and procedurally defaulted. Resp. Ex. 10-12. Petitioner concedes that this claim is unexhausted and again seeks to overcome any procedural bar under the purviews of Martinez. Doc. 21 at 13.

Here, Petitioner has failed to overcome this procedural bar because nothing suggests that the trial court would have granted a motion to dismiss the information based on Florida's "Stand Your Ground" law, § 776.013, Florida Statutes; and thus, this claim is not substantial.

Section 776.013, Florida Statutes, or Florida's "Stand Your Ground Law," provides:

> A person who uses or threatens to use force as permitted in s. 776.012, s. 776.013, or s. 776.031 is justified in such conduct and is immune from criminal prosecution and civil action for the use or threatened use of such force by the person, personal representative, or heirs of the person against whom the force was used or threatened**, unless the person against whom force was used or threatened is a law enforcement officer, as defined in s. 943.10(14), who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law or the person using or threatening**

> **to use force knew or reasonably should have
> known that the person was a law enforcement
> officer.** As used in this subsection, the term "criminal
> prosecution" includes arresting, detaining in custody,
> and charging or prosecuting the defendant.

§ 776.032(1), Fla. Stat. (2007) (emphasis added). Here, had trial counsel filed a

motion to dismiss as Petitioner suggests, the trial court would have conducted

an evidentiary hearing on the motion where the state would have presented the

same testimony and evidence as it did at trial. Considering the evidence

presented at trial showing that Petitioner knew or should have known that he

was using deadly force against a law enforcement officer, the trial court would

not have granted a motion to dismiss based on the "Stand Your Ground"

immunity. As such, this claim lacks merit and is insubstantial; therefore,

Petitioner cannot rely on <u>Martinez</u> to excuse the procedural default of this

claim. Likewise, Petitioner has failed to demonstrate that failure to consider

this claim on the merits will result in a fundamental miscarriage of justice.

Ground Five is due to be denied.

**Ground Six**

Petitioner asserts that his trial counsel was ineffective for failing to object

to the state's impermissible impeachment of defense expert Dr. Krop using the

testimony of Dr. Miller, an expert who testified at the first trial but passed away

prior to the third trial. Doc. 17 at 22.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. D1 at 54.

43

The trial court summarily denied the claim as follows:

> In his fourth claim for relief, Defendant asserts that counsel was ineffective for failing to object to [the] expert witness testimony of Dr. Harry Krop. Defendant argues that the State impermissibly testified via statements posed as questions to the witness, but the portion of the trial transcript quoted contains merely leading questions, which are permissible on cross-examination. See Kembro v. State, 346 So. 2d 1083, 1084 (Fla. 1st DCA 1977). The State did not "testify." Defendant also argues that it was impermissible to impeach Dr. Krop with the opinion of Dr. Miller, who did not testify (he was deceased by then), but who examined Defendant two-and-a-half years before Dr. Krop did, and concluded Defendant did not have PTSD. "One impeaches an expert's opinion by the introduction of a contrary opinion based on the same facts." Nowitzke v. State, 572 So. 2d 1346, 1352 (Fla. 1990). There was no impermissible impeachment. Ground Four is without merit.

Resp. Ex. D1 at 142-43 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. D5.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court notes that in Florida, "[o]ne impeaches an expert's opinion by the introduction of a contrary opinion based on the same facts." Nowitzke, 572 So. 2d at 1352. Here, the state, on cross-examination, used Dr. Miller's prior evaluation to impeach Dr. Krop's diagnosis of Petitioner as having PTSD. Resp. Ex. D1 at 312-13. This was a proper impeachment, and thus any objection from

44

counsel would have been meritless. To that end, upon review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>See</u> 28 U.S.C. § 2254(d). Ground Six is denied.

**Ground Seven**

Petitioner argues that his appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in instructing the jury on the inapplicable "stand your ground/no duty to retreat" portion of § 776.013(3), Florida Statutes. Doc. 17 at 25.

Following Petitioner's third trial and direct appeal, he filed a petition with the First DCA raising this current claim of ineffective assistance of appellate counsel. Resp. Ex. C1 at 8. The First DCA issued an opinion denying the petition, which provided in full – "The petition alleging ineffective assistance of appellate counsel is denied on the merits." Resp. Ex. C4.

Thus, the Court addresses Petitioner's ineffective assistance of appellate counsel claim under the deferential standard for federal court review of state court adjudications. In doing so, the Court gives considerable deference to appellate counsel's strategic decision of selecting the issue or issues to raise on appeal. The danger of raising weaker issues in a "kitchen-sink" approach is that it detracts from the attention an appellate court can devote to the stronger

issues and reduces appellate counsel's credibility. See Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989); see also McBride v. Sharpe, 25 F.3d 962, 973 (11th Cir. 1994). Thus, effective appellate attorneys "will weed out weaker arguments, even though they may have merit." Philmore, 575 F.3d at 1264; see also Overstreet, 811 F.3d at 1287. Appellate counsel's failure to raise a meritless or weaker issue does not constitute deficient performance. See Brown v. United States, 720 F.3d 1316, 1335 (11th Cir. 2013) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)); Owen, 568 F.3d at 915. Prejudice results only if "the neglected claim would have a reasonable probability of success on appeal." Philmore, 575 F.3d at 1264-65.

As explained in Ground One above, it was error to include § 776.013(3)'s unlawful activity/duty to retreat language in the jury instruction for justifiable use of deadly force. Because Petitioner presented evidence supporting a defense under § 776.012, he was entitled to receive an instruction that followed only the language of that statute. See Garrett, 148 So. 3d at 471 (citing Little, 111 So. 3d at 214 (explaining at length the distinguishing characteristics of § 776.012 and § 776.013(3)). But during Petitioner's direct appeal, appellate counsel did not have the benefit of the Second DCA's decision in Little, the case on which the First DCA relied, because it was issued in April 2013; nor did appellate counsel have guidance from the flurry of post-Little case law clarifying the distinct avenues of § 776.012 and § 776.013(3). See Dooley, 268 So. 3d at 887.

46

Instead, on this record, trial counsel did not object and preserve any error for appellate counsel to pursue on appeal, and instead the parties agreed at trial that at that time, the justifiable use of deadly force instruction used tracked the standard jury instruction. Resp. Ex. B14 at 815-16.

In any event, Petitioner has failed to show prejudice under Strickland. While the improper instruction required the jury to consider if Petitioner had a duty to retreat based on unlawful activity, the trial court also instructed that the lawfulness of Petitioner's activity had no impact on Petitioner's actions if Petitioner reasonably believed that force was necessary to prevent imminent death or great bodily harm. Resp. Ex. B1 at 170-71; see also § 776.012, Fla. Stat. (2009) ("[A] person is justified in the use of deadly force and does not have a duty to retreat if . . . [h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.").

Considering the totality of the evidence, as well as the jury instructions as a whole, the jury had ample facts to conclude that Petitioner was not justified in using deadly force. As such, Petitioner cannot show that but for appellate counsel's alleged error, a reasonable probability exists that the outcome of his appeal would have been different. Thus, under the deferential standard of AEDPA review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an

47

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>See</u> 28 U.S.C. § 2254(d). Ground Seven is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.      The Second Amended Petition (Doc. 17) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.      The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.      If Petitioner appeals the dismissal of this case, the Court denies a certificate of appealability.[10] Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

---

[10] The Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)). Upon due consideration, the Court will deny a certificate of appealability.

**DONE AND ORDERED** at Jacksonville, Florida, this 13th day of March, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

Jax-7

C:    Jacquan Shootes, #J36198
       Counsel of record

49